IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

```
KALAKE FONUA and KENNETH ASHTON           No. 09-05983 CW
FONUA,
                                          ORDER GRANTING
            Plaintiffs,                   DEFENDANTS'
                                          MOTION FOR
    v.                                    SUMMARY JUDGMENT

THE CITY OF SAN MATEO; THE SAN MATEO
POLICE DEPARTMENT; CHIEF OF POLICE
SUSAN E. MANHEIMER; SAN MATEO POLICE
OFFICERS LEISHMAN, BOLOGNA and
BENNET; and SERGEANT MEFFORD,

            Defendants.
                                      /
```

Defendants City of San Mateo, San Mateo Police Department, San Mateo Chief of Police Susan Manheimer, San Mateo Police Officers Leishman, Bologna, and Bennet and San Mateo Police Sergeant Mefford move for summary judgment on all the claims in Plaintiffs' complaint. Plaintiffs Kalake Fonua and Kenneth Ashton Fonua are father and son. Plaintiff Kenneth Ashton Fonua has filed an opposition to the motion. The matter was taken under submission and decided on the papers. Having considered all the papers filed by the parties, the Court grants Defendants' motion for summary judgment.

BACKGROUND

At about 12:16 a.m. on May 24, 2009, a group of people waved down Officer Tanya Neu in the parking lot of the King Center at 725

Monte Diablo in San Mateo, California.  She observed three Hispanic men on the west side of the parking lot near the curb.  One of the men, Juan Pantoja had his shirt torn off.  Francisco Barajas Avina was bleeding profusely from his right ear, which had been bitten off.  Another man, Marco Cruz, was a witness to the events.  Two Polynesian brothers, Sisivaivai and Sione Fonua, stood on the east side of the parking lot, each holding the lid to a metal garbage can.  Avina told Officer Neu that the Fonua brothers had stolen his wallet and the Fonua brothers told Officer Neu that they had been "jumped."

Medics from the Fire Department arrived, treated Avina's injuries and transported him to Stanford Hospital.  Officers Miller, Bologna and Leishman arrived a few minutes later.  Officer Neu spoke with Pantoja and Cruz, with Officer Bennett, a certified Spanish translator, interpreting.  Pantoja and Cruz said that they were walking northbound on North El Dorado when Avina told Pantoja that he saw some "black males" walking southbound on North El Dorado.  One of these "black" men grabbed Pantoja by the neck and shoved him in the shrubs.  Another man hit Pantoja in the head with a full beer can, which burst open.  One of the men began reaching into Pantoja's left pants pocket and tried to get his wallet.  Later, Pantoja identified Sisivaivai Fonua as the man who had grabbed him by the neck and thrown him in the shrubs.  When Officer Neu examined the shrubs, she found damage consistent with Pantoja's account.  Pantoja also directed Officer Neu to a wet area in the street where she smelled freshly spilled beer.

Pantoja and Cruz stated that a third "black" man attacked

2

1 Avina and described him as the largest of the three attackers, with
2 long curly hair.  This man grabbed Avina by the neck, pushed him to
3 the ground and demanded his money.  Avina struggled against his
4 attacker, and the other two men assaulting Pantoja let him go and
5 joined in the assault of Avina.  One of the attackers bit off a one
6 inch piece of Avina's upper right ear.  Avina was struck many times
7 in the face and, as a result, his face was bloodied, lacerated and
8 swollen.

9     Pantoja and Cruz stated that the "black" assailants got up and
10 ran away back toward the King Center and that Pantoja, Avina and
11 Cruz chased them to recover Avina's wallet.  As they approached the
12 King Center, two of the assailants grabbed garbage can lids and
13 turned toward Pantoja, Avina and Cruz to strike them.  Pantoja
14 later confirmed that the two men holding the garbage can lids, who
15 were later detained in the parking lot, Sione and Sisivaivai Fonua,
16 were the men who attacked him and Avina.  The third male suspect
17 continued to run eastbound.

18     Pantoja told Officer Neu that all of the assailants were
19 "black" men and described the third person who fled as six foot one
20 with a stocky build.  Pantoja stated that he would be able to
21 identify the third suspect if he saw him again.  Because the two
22 men holding the garbage can lids were Polynesian, not African-
23 American, Officer Neu asked Pantoja to clarify the race of the
24 suspects.  Pantoja said all three assailants had the same skin
25 color as the two Polynesian men detained in the parking lot.

26     Pantoja took Officer Neu to the area where Avina had been
27 assaulted and, on the street, they found a wallet containing photos

28

United States District Court
For the Northern District of California

of Avina's family and a one dollar bill.  Officer Neu also observed a fresh pool of blood.  Avina's cell phone was recovered nearby.

Meanwhile, Officer Leishman interviewed Sione and Sisivaivai Fonua.  Sione Fonua said that Sisivaivai had been drinking.  They were walking through the park area of the Martin Luther King Center, when a Hispanic male punched Sisivaivai in the face.  Sione came to his brother's aid.  Sione admitted that he punched Avina in the face and kicked him in the neck.

After they conducted the interviews, Officer Bennett informed Officer Leishman that a third man had participated in the assault.  Officer Leishman asked Sisivaivai if there was a third individual associated with him and Sione, and Sisivaivai replied, "I don't know, he might have been."

Based on the evidence at the scene corroborating the statements of the Hispanic victims, as well as the severity of Avina's injuries, Officer Leishman placed Sione and Sisivaivai Fonua under arrest, charging them both with robbery and conspiracy and charging Sione with assault with a deadly weapon and mayhem based on his kicking Avina in the neck and biting a chunk of flesh from his ear.

Officer Leishman believed that the third man involved in the assault was Kenneth Fonua.  This belief was based on the following factors: (1) Kenneth Fonua was a close relative of Sione and Sisivaivai Fonua; (2) Kenneth Fonua had a criminal history and was known to be a member of the West Side Tonga gang, as were Sisivaivai and Sione; (3) Kenneth Fonua had been observed by other officers in the presence of Sisivaivai and Sione on separate

4

occasions several days prior to the assault; (4) Kenneth Fonua fit Pantoja's physical description of the third assailant. The fact that the victims had identified the three assailants as "black males" did not dissuade Officer Leishman from his belief that Kenneth Fonua was the third assailant because the victims had subsequently said that all three assailants generally had the same skin tone and the two suspects arrested at the scene, Sione and Sisivaivai Fonua, were Polynesian, not "black."

To test his suspicion that Kenneth Fonua was the third assailant, Officer Leishman created a "6 Pack Photo Line Up" by entering Kenneth Fonua's race, age, weight, hair and eye color, visible tattoos and other physical characteristics into a database of booking photos, which generated a pool of images. Officer Leishman picked the five individuals who were the closest facial matches to Kenneth Fonua.

On May 24, 2009, Officers Bennett and Leishman went to Pantoja's residence to conduct the "6 Pack Photo Line Up." Kenneth Fonua's photograph was in the third position. Officer Bennett read the San Mateo Police Department Line Up Admonition to Pantoja. Officer Leishman signed the Photo Line Up Admonition and then stepped back while Officer Bennett showed Pantoja the photo line up. Without prompting, Pantoja immediately identified Kenneth Fonua's picture in the third position. Pantoja stated in Spanish to Officer Bennett, "That's the guy's face for sure, but his hair was lower." When asked what he meant by "lower," Pantoja replied, "the hair was combed back and looked like it had gel in it." Kenneth Fonua has admitted that his hair, at that time, was longer

5

than his hair appears in the photograph and he generally wore it tied back in a ponytail. Pantoja circled the number 3, indicating that he was identifying the individual in position number 3.

The officers thought that Pantoja's clarification of how Kenneth Fonua's hair differed reinforced his identification. During the time Pantoja was viewing the photographs, neither of the officers made any verbal or nonverbal indication of which picture represented the person that they suspected was the third assailant.

After Pantoja's identification, Officer Leishman requested that a warrant be issued for Kenneth Fonua's arrest for robbery, battery, conspiracy and mayhem. Before the warrant issued, Kenneth Fonua approached another officer who arrested him because the officer was aware of Officer Leishman's findings of probable cause.

Fifty days later, Kenneth Fonua's attorney requested a live lineup, at which Pantoja was unable to identify Kenneth Fonua. Kenneth Fonua was then released from custody.[1]

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

---

[1] Neither party provides evidence of when Kenneth Fonua was released from custody. In their motion, Defendants indicate that he was released before the preliminary hearing. In his opposition, Kenneth Fonua states that he was released from custody after fifty days and after he "went to trial." However, there is no evidence that he was brought to trial.

6

United States District Court / For the Northern District of California

1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if it is supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

PRELIMINARY ISSUES

I. Evidentiary Objections

Defendants object to the statements Kenneth Fonua makes in his opposition about attorney David King, who is representing Defendants in this action. The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence. The Court will not discuss each objection individually. To the extent that the Court has relied on evidence to which Defendants object, such evidence has been found admissible and the objections are overruled.

II. Standing

Defendants argue that Kalake Fonua, Kenneth Fonua's father,

7

lacks standing to sue because there is no cognizable theory under which he might recover in that he did not suffer any injury. Kenneth Fonua does not address this argument in his opposition and, thus, concedes it. Therefore, summary judgment is granted to Defendants on the claims of Kalake Fonua.

DISCUSSION

In his complaint, Kenneth Fonua asserts the following causes of action: (1) arrest without probable cause; (2) kidnaping; (3) false imprisonment; (4) intentional infliction of emotional distress; (5) violation of federal due process rights; (6) defamation; and (7) vicarious liability against Police Chief Manheimer and the City of San Mateo.

I. Claims Based on Probable Cause

Kenneth Fonua's federal due process claim and state claims for false arrest and false imprisonment are all based on his arrest, allegedly without probable cause. They are addressed together.

A. Legal Standard

1. Federal Due Process Claim

Under federal law, a claim of unlawful arrest is cognizable under 42 U.S.C. § 1983 for violation of the Fourth Amendment's prohibition against unreasonable search and seizure if the allegation is that the arrest was without probable cause or other justification. Pierson v. Ray, 386 U.S. 547, 555-558 (1967); Larson v. Neimi, 9 F.3d 1397, 1400 (9th Cir. 1993). An arrest is supported by probable cause if, under the totality of the circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the

8

defendant had committed a crime. Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).

The inquiry is not whether the suspect actually committed the offense, but whether a reasonable officer would have had probable cause to think that the suspect committed the offense. Blankenhorn v. City of Orange, 485 F.3d 463, 475 (9th Cir. 2007). "'[P]robable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.'" Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir. 2006) (quoting Franks v. Delaware, 438 U.S. 154, 165 (1978)). A claim for wrongful detention or false imprisonment, absent a cognizable claim for wrongful arrest, will not ordinarily state an independent claim under § 1983. Baker v. McCollan, 443 U.S. 137, 142-145 (1979).

Liability may be imposed on an individual defendant under § 1983 if the plaintiff can show that the defendant proximately caused deprivations of his federally protected rights. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988); Harris v. City of Roseburg, 664 F.2d 1121, 1125 (9th Cir. 1981). The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. Leer, 844 F.2d at 633.

Respondeat superior is not a sufficient basis for imposing liability under § 1983. Monell v. New York City Dep't of Social Services, 436 U.S. 658, 663-64 n.7 (1978) (no liability for local

9

governments under theory of respondeat superior); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680 (9th Cir. 1984). In order to establish liability of a supervisor, a plaintiff must submit evidence showing that the supervisor proximately caused deprivation of his rights, Harris, 664 F.2d at 1125, or that the supervisor failed properly to train or supervise personnel, which resulted in the alleged deprivation, that the alleged deprivation resulted from official policy or custom for which the defendant was responsible, or that the defendant knew of the alleged misconduct and failed to act to prevent future misconduct. Ybarra, 723 F.2d at 680-81; Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

2. State Torts of False Arrest and False Imprisonment

False imprisonment under California law is the "'unlawful violation of the personal liberty of another.'" Martinez v. City of Los Angeles, 141 F.3d 1373, 1379 (9th Cir. 1998). False arrest is not a different tort; it is merely one way of committing a false imprisonment. Id. In California, "the elements of a claim of false arrest or false imprisonment are: (1) the non-consensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." Tekle v. United States, 511 F.3d 839, 851 (9th Cir. 2007). Officers are not liable for false imprisonment or false arrest if they "had reasonable cause to believe the arrest was lawful." O'Toole v. Sup. Ct., 140 Cal. App. 4th 488, 510 (2006).

> Reasonable cause to arrest exists when the facts known to the arresting officer would lead a reasonable person to have a strong suspicion of the arrestee's guilt. This is an objective standard.

10

Id. at 511 (citations omitted).

Under California Penal Code § 847, "no cause of action shall arise against any peace officer . . . , acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest when . . . [t]he arrest was lawful . . ." See e.g., Blankenhorn, 485 F.3d at 486-87 (arresting officers entitled to immunity pursuant to § 847(b) on false imprisonment claim where they had probable cause to arrest plaintiff for trespassing and acted within scope of their authority).

B. Analysis

As Defendants point out, the arresting officer has not been named as a defendant in this action. Defendants argue that the arresting officer had probable cause to arrest Kenneth Fonua based on the fact that Defendant officers had probable cause to believe that Kenneth Fonua was the third assailant involved in the attack upon Avina and Pantoja. Defendants base their argument on all of the evidence described above. These factors, taken together, were more than sufficient to establish probable cause to arrest Kenneth Fonua as the third assailant.

Kenneth Fonua argues that the officers did not have probable cause to arrest him for the following reasons: (1) the victims stated that the third assailant was "black," and he is not black-- he is Polynesian and his skin tone is light brown; (2) Pantoja's identification of him in the photo lineup must have been manipulated by Officers Leishman and Bennett because, at the in-person lineup, Pantoja could not identify him; and (3) there is no other evidence that he was involved in the assault.

11

1    First, the fact that the victims described the third assailant
2 as a "black man" does not detract from the probable cause because
3 they described all of the assailants as "black."  The victims
4 confirmed that the third assailant had the same skin tone as
5 Sisivaivai and Sione Fonua, who were positively identified as two
6 of the three assailants.  It is undisputed that Sisivaivai and
7 Sione Fonua are of Polynesian descent and have the same skin tone
8 as Plaintiff.  Therefore, it is apparent that the victims thought
9 that all the assailants were "black."  The facts that Polynesians'
10 skin tone is light brown, or that Kenneth Fonua takes offense at
11 being called "black," are of little importance to the determination
12 of whether the victims' identification of Plaintiff was accurate.
13   Second, Plaintiff presents no evidence that Pantoja's
14 identification of his picture in the photo lineup was tainted.
15   Finally, as discussed above, the gravamen of Kenneth Fonua's
16 claims is whether a reasonable officer would have had probable
17 cause to think that Kenneth Fonua participated in the assault.  See
18 Blankenhorn, 485 F.3d at 475.  Therefore, whether Kenneth Fonua
19 actually took part in the assault is not determinative of his
20 claims.
21   In evaluating the validity of an eyewitness identification for
22 purposes of probable cause, the court determines whether the
23 officers employed an identification procedure so impermissibly
24 suggestive as to give rise to a substantial likelihood of
25 misidentification and, if so, whether the witness exhibited
26 sufficient indicia of reliability to protect the integrity of the
27 identification.  Grant v. City of Long Beach, 315 F.3d 1081, 1086

12

(9th Cir. 2002). An identification procedure is impermissibly suggestive when it emphasizes a single individual, thereby increasing the likelihood of misidentification. United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985); see, e.g., United States v. Burdeau, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement, hue and facial expression were insubstantial differences between defendant's photograph and the others in a photographic array and did not create an impermissible suggestion that defendant was the offender). Indicia of reliability of an identification from a lineup include: (1) the opportunity to view the perpetrator at the time of the crime; (2) the degree of attention paid to the perpetrator; (3) the accuracy of the prior description of the perpetrator; (4) the level of certainty demonstrated at the time of the identification; and (5) the length of time between the crime and the identification. Grant, 315 F.3d at 1087.

The photographic lineup was not suggestive. The officers conducting the photo lineup chose photographs of men whose facial characteristics closely matched those of Kenneth Fonua. Leishman Dec., Ex. 5, photo lineup. Five of the six men in the photo array look Polynesian. Id. All the men in the photo array have dark hair; three have long hair and three have short hair.

Even if the lineup had been suggestive, there were indicia of reliability. Pantoja had an opportunity to view the third assailant at the time of the assault, when Sisivaivai let him go to join the other two in assaulting Avina. When questioned immediately after the crime, Pantoja described the third assailant

13

as having physical characteristics consistent with those of Kenneth Fonua.  Leishman Dec. at ¶ 6.  Also, at the scene, Pantoja told Officer Neu that he could identify the third assailant if he saw him again.  Carlson Dec., Ex. 1, Officer Neu's Supplemental Report. Pantoja was presented with the photo lineup just hours after the assault.  Leishman Dec. at ¶ 11.  Finally, in identifying Kenneth Fonua from the photo array, Pantoja displayed a high level of certainty, stating "that's the guy's face for sure."

Although Kenneth Fonua speculates that the officers conducting the photo lineup "cunningly coached" or "deliberately pressured" Pantoja to choose Kenneth Fonua's photograph, there is absolutely no evidence of this.  Kenneth Fonua's argument that Pantoja's inability to identify him at the subsequent in-person lineup negates his identification in the photo lineup is without merit. The in-person lineup is not relevant to whether Defendant officers had probable cause to arrest Kenneth Fonua immediately after the assault took place.

Kenneth Fonua has failed to raise a disputed issue of material fact that the Defendant officers did not have probable cause to arrest him.  Because the claims for false arrest and false imprisonment fail, his claim for kidnap also fails.  See Farnsworth v. Cote, 199 Cal. App. 2d 762, 768 (1962) (because confinement was incident to a lawful arrest, plaintiff could not recover for tort of kidnaping).  Furthermore, because the liability of Police Chief Manheimer and the City of San Mateo are based upon a finding of illegal conduct on the part of Defendant Officers, the claims against these Defendants also fail.  For all of these reasons,

14

1  summary judgment is granted in favor of Defendants on the federal
2  claim of a due process violation and the state claims for false
3  arrest, false imprisonment and kidnaping.

## II. Defamation and Intentional Infliction of Emotional Distress

Defamation is the publication of false and unprivileged information which exposes the defamed person to hatred, contempt, ridicule, or obloquy, or causes the person to be injured in his or her occupation. See Cal. Civ. Code §§ 45, 46; Rothman v. Jackson, 57 Cal. App. 4th 1134, 1140 (1996).

The elements of a cause of action for intentional infliction of emotional distress are (1) extreme and outrageous conduct (2) intended to cause or done in reckless disregard for causing (3) severe emotional distress and (4) actual and proximate causation. Cervantez v. J.C. Penney Co., Inc., 24 Cal. 3d 579, 593 (1979). The conduct must be so extreme as to "exceed all bounds of that usually tolerated in a civilized community," id., and the distress so severe "that no reasonable [person] in a civilized society should be expected to endure it." Fletcher v. Western National Life Insurance Co., 10 Cal. App. 3d 376, 397 (1970).

Defendants argue that they are immune from these torts pursuant to California Government Code § 821.3, which provides that a public employee is not liable for injury caused by the instituting or prosecuting of a judicial or administrative proceeding within the scope of employment, even if the employee acts maliciously and without probable cause.

Defendants are correct that § 821.3 immunizes them from liability on these claims. Further, Kenneth Fonua presents no

15

argument or facts supporting his claims for defamation or intentional infliction of emotional distress.  Therefore, summary judgment is granted in favor of Defendants on the claims for defamation and intentional infliction of emotional distress.

CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment is granted.  Judgment in favor of Defendants shall be entered separately.  The parties shall bear their own costs of suit.

IT IS SO ORDERED.

Dated: 6/13/2011



CLAUDIA WILKEN
United States District Judge

16